DEAD RIVER COMPANY

*vs.*

ASSESSORS OF HOULTON

Aroostook.   Opinion, December 17, 1953.

*Locke, Campbell, Reid and Hebert,* for plaintiff.

*James P. Archibald,* for defendant.

SITTING: MERRILL, C. J., THAXTER, FELLOWS, WILLIAMSON, TIRRELL, WEBBER, JJ.

WEBBER, J. On report. This was an appeal from the decision of the assessors of the Town of Houlton declining to abate a portion of taxes assessed to the appellant, Dead River Company, a corporation which was for purposes of taxation as of April 1, 1951 an inhabitant of the City of Bangor. Appellant maintains a place of business in Houlton, where a wholesale and retail oil business is conducted and where it buys some wood. Included in the assessment was an item of ties and lumber valued at $350 and producing a tax of $28.35. Actually this personal property comprised 35 cords of pulpwood and 200 ties. Some time in early April of 1951 and again in the middle of June, a Houlton assessor conferred with a corporate officer acting for appellant, who told the assessor of the existence of the ties and pulpwood, their value and location in Houlton. A rough

list of the items in question and their value was prepared and retained by the assessor. At these conferences the position of the appellant was that, although it was the owner of the items, they were in transit and therefore claimed not taxable in Houlton. After receipt of the tax bill, the appellant by its counsel on November 24, 1951 filed application for abatement and by letter indicated that the pulpwood and ties were deemed manufactured lumber in transit. On December 3, 1951 counsel by letter advised the assessors that the ties were the property of another company, and that the pulpwood was destined for a specific mill owned by a third party in another town to be manufactured therein. We find no satisfactory explanation in the evidence as to exactly when the appellant determined that it was not the owner, what basis or reasons, if any, it had for such determination, or what may have occurred, if anything, to cause accident or mistake with regard to title.

With regard to the pulpwood, appellant now takes the position that it had a contract with the Great Northern Paper Company to procure pulpwood from producers and ship to various points in Aroostook County. No written contract is shown. Appellant bought the pulpwood in question from third parties and on April 1, 1951 the pulpwood was located on a railroad siding in Houlton awaiting railroad cars for shipment. The pulpwood ultimately went to the Great Northern Paper Company at Millinocket, Maine, where that company manufactures paper. The representative of the appellant testified in substance that he considered the wood on April 1, 1951 to be still the property of appellant and in its possession. The assessors saw the pulpwood on the siding, but otherwise admittedly have no knowledge of the facts other than their dealings with appellant and the information given them by the appellant.

With regard to the ties, appellant now takes the position that on April 1, 1951 they belonged to the Cedar Tie Com-

pany of Bangor and had been delivered to the Bangor & Aroostook Railroad Company siding in Houlton apparently to be sold to the Railroad, and that they were there awaiting inspection by a Railroad representative preliminary to final payment. The ties were finished and ready for use. There is no suggestion in the evidence as to where the Cedar Tie Company procured the ties, whether or not appellant had had some prior connection with the ties, what transactions may have occurred tending to place title in the Cedar Tie Company as of April 1, 1951, or what reasons, if any, the representatives of appellant may have had during approximately six months after April 1, 1951 to deem the ties the property of appellant.

The parties agree that they are primarily concerned with novel legal issues, here presented, rather than with the relatively small tax involved.

The first issue for consideration is whether or not it is open to appellant at this stage to claim abatement as to any of the property in dispute on the ground that it was not the owner thereof on April 1, 1951.

R. S., 1944, Chap. 81, Sec. 35 provides as follows:

"Before making an assessment, the assessors shall give seasonable notice in writing to the inhabitants by posting notifications in some public place in the town, or shall notify them, in such other way as the town directs, to make and bring in to them true and perfect lists of their polls and all their estates real and personal, not by law exempt from taxation, of which they were possessed on the 1st day of April of the same year. If any resident owner after such notice, *or any non-resident owner after being reasonably requested thereto by the assessors,* does not bring in such list, he is thereby barred of his right to make application to the assessors or the county commissioners for any abatement of his taxes, unless he offers such list with his application and satisfies them that he was unable

to offer it at the time appointed. The request upon non-resident owners may be proved by a notice sent by mail directed to the last known address of the taxpayer *or given by any other method that brings notice home to the taxpayer.*" (Emphasis supplied)

Section 38 of that chapter provides as follows:

"The assessors or any of them may require the person presenting the list required by section 35 to make oath to its truth, which oath any of them may administer, and any of them may require him to answer all proper inquiries in writing as to the nature, situation, and value of his property liable to be taxed in the state, and a refusal or neglect to answer such inquiries and subscribe the same bars an appeal to the county commissioners, but such list and answers shall not be conclusive upon the assessors."

It is not disputed here that appellant, through its duly authorized representative, did, as the result of an interview which brought notice home to the appellant, prepare the required list and answer all inquiries. In so doing, appellant merely complied with the law and, in fact, had no choice if it desired to retain status as a claimant for abatement.

The appellant having given the required information to the assessor including the fact that it was the owner of the property in dispute, the assessors having thereafter acted in reliance on such information in assessing the tax, can the appellant now deny that ownership in pursuit of an abatement?

Our examination of the authorities indicates that this question is one of novel impression in this state. It has been almost universally held that where one files a list or otherwise gives information to assessors upon inquiry, at least in the absence of fraud, accident or mistake, the taxpayer is later estopped to deny his ownership or such other basic and

essential facts upon which the assessors relied in making their assessment. For cases supporting this view, see notes found in 7 Ann. Cas. 862 and in 17 Ann. Cas. 1031. The rule has been applied to create estoppels to deny ownership, *Inland Lumber* v. *Thompson,* 11 Idaho 508; *People* v. *Stockton R. R. Co.,* 49 Cal. 414; *Hamacker* v. *Bank,* 95 Wis. 359; *Union School Dist.* v. *Bishop,* 76 Conn. 695, 58 A. 13; to assert an exemption, *Dennison* v. *County Commissioners,* 153 Ill. 516; to reduce valuation, *Blake* v. *Young,* 128 Okla. 153, 261 P. 923; *Kentucky River* v. *Knott County,* 54 S. W. (2nd) (Ky.) 377; to assert non-residence, *Matter of Mc-Lean,* 138 N. Y. 158, 33 N. E. 821; to assert taxability in another county, *Slimmer* v. *Chickasaw County,* 140 Iowa 448, 118 N. W. 779; to reduce acreage, *Bankers Coal Co.* v. *County Court,* 62 S. E. (2nd) (W. Va.) 801 (case decided on another ground).

The Massachusetts Court, on the contrary, refused to invoke an estoppel against a taxpayer whose property was not in fact taxable in the taxing town in *Charleston* v. *County Commissioners,* 109 Mass. 270; or where property was used for a public purpose and therefore not taxable in *Milford Water Company* v. *Hopkinton,* 192 Mass. 491. However, in *Williams* v. *Brookline,* 194 Mass. 44 the court seems to accept the principle of estoppel as applicable under some circumstances in these words:

"Under the circumstances of this case we think that the question whether the tax is invalid by reason of being assessed to the petitioners as executors rather than as trustees is not open to the petitioners. They are executors and trustees under the will, and seem to have considered this property as held by themselves as executors, and so represented to the assessors. It is not a case where the property is not taxable, as in *Milford Water Co.* v. *Hopkinton,* 192 Mass. 491."

And again the court in denying an estoppel in *Hamilton Mfg. Company* v. *City of Lowell,* 274 Mass. 477, 175 N. E.

73, placed emphasis on the reliance put upon the listing by assessors in these words:

"The defendant urges that the complainant is thereby estopped now to contend that the machinery was not subject to taxation. It is manifest that the assessors of Lowell were not misled by the list. It was accepted as true except as to valuation. No attack is now made on its verity. The transaction lacks essential elements of estoppel."

The statutory requirement as to the production of lists is a rigorous one and has been rigorously followed by our court even in cases where there existed on the part of the taxpayer an honest misapprehension as to the facts (See *Edwards Mfg. Co.* v. *Farrington*, 102 Me. 140). The statute clearly requires the production of "true and perfect lists * * * * * of all their estates real and personal, not by law exempt from taxation," and this requirement is imposed on non-resident owners by reasonable request made by the assessors by mail or in some form brought to the actual notice of the non-resident. Justice Fellows said in *Perry et al.* v. *Town of Lincolnville*, 145 Me. 362 at 365:

"The purpose of this statute, which requires notice by the assessors and the furnishing of lists by the taxpayer, is to assist the assessors in making a correct and complete assessment. If no lists are supplied, the assessors must use their own judgment on information they may otherwise obtain, and the owner of property has no right to make application for abatement if he files no lists. The lists are used by the assessors, in arriving at the amount of property and values, in making their assessments. * * * * * The lists, required under the notice and given to the assessors, *are therefore to furnish correct information to the assessors*, and if the assessors desire, they have the right to require the individual, who files the list, to make oath to the same and to furnish other and additional information." (Emphasis supplied)

The owner is in the best position to know the facts as to title and related matters, and surely he is in far better position to know the facts than are the assessors. The assessors must be given the right to rely on the truth and perfection of the lists and their accuracy, at least until the contrary appears, and to act on that reliance. If there is doubt, as for example where a title is in dispute or in litigation, the taxpayer may state the facts and thereby disclose the existence of property which may be taxable and avoid that secrecy and concealment which are the great impediment to tax assessment and which the quoted statutes are designed to remove.

Here the taxpayer disclosed ownership without qualification. Later, after assessment in reliance thereon and even after the filing of petition for abatement, the appellant denied ownership for the first time. The reasons for this change of position nowhere appear in the evidence. Upon the facts peculiar to this case, the appellant is estopped to deny its ownership or seek any abatement from taxes for that reason. It is unnecessary to decide here and we neither suggest nor infer what our holding might be if we were presented with other facts and circumstances, or if it were apparent upon the evidence that a taxpayer while acting in good faith and without intention to mislead the assessors had made an honest mistake in the information produced for the assessors.

Assuming then that appellant was the owner of the pulpwood and ties on April 1, 1951, were they taxable by Houlton?

By the terms of R. S., 1944, Chap. 81, Sec. 12, personal property is assessable to the owner in the town of his residence, in this case Bangor, unless it falls within said stated exceptions.

R. S., 1944, Chap. 81, Sec. 13, Subsec. 1 as amended by P. L., 1949, Chap. 431, provides those exceptions as follows:

"All personal property employed in trade, in the erection of buildings or vessels, or in the mechanic arts shall be taxed in the town where so employed on the first day of each April; provided that the owner, his servant, sub-contractor, or agent so employing it occupies any store, storehouse, shop, mill, wharf, landing place or ship yard therein for the purpose of such employment, except as hereinafter otherwise provided in this sub-section. Portable mills, logs in any town to be manufactured therein, and all manufactured lumber excepting lumber in the possession of a transportation company and in transit, all potatoes stored awaiting sale or shipment, except those owned by and in the possession of the producer, house trailers not properly to be taxed as stock in trade, store fixtures, office furniture, furnishings, fixtures and equipment, and professional libraries, apparatus, implements and supplies and coin operated vending or amusement devices, and all manufactured merchandise except products either intended for manufacture into other products or used or for use in connection therewith and except merchandise in the possession of a transportation company or other carrier for the purpose of transporting the same, shall be taxed in the town where situated on the first day of April each year."

In general, it may be said that the apparent purpose and design of the statute is "to prevent certain kinds of property, held and managed at a distance from the place of the owner's residence, from thereby escaping taxation." (See *Inhabitants of Ellsworth* v. *Brown,* 53 Me. 519). The situation may be likened to that which arises when several magnets are attracting the same piece of metal in different directions. Certain factors tend to draw after them for the purpose of taxation the property of the taxpayer, and the task of assessing authorities is to determine accurately by

legal statutory standards in what direction the property is effectively drawn. For example, there is the "pull" of the owner's residence; there is the "pull" of the physical presence of property in a particular place on April 1st; and there is the "pull" of an established business of the owner which may be in still another location in which the property may soon be employed in trade, or building, or the mechanic arts. There is also an underlying factor of the degree of permanence and finality of the physical presence of the property in a particular location on the effective tax date, as contrasted with a physical presence that is transient and fleeting as where the property is temporarily lodged and halted in a moving, flowing stream of commerce. (See *Bradley* v. *Fibre Company*, 104 Me. 276). It is with such considerations in mind that the court must construe and apply the applicable statutes in particular situations.

Such terms as "timber," "logs," "pulpwood," and "railroad ties" have no fixed definition in the law. Our examination of the authorities reveals that any one of such terms may have one meaning when used in a lien statute, another when used in a contract made by parties, and still a third when a tax statute is involved. As was said in *Bearce* v. *Dudley*, 88 Me. 410 at 416:

> "With so many peculiar significations, the intended meaning of the word usually depends upon the connection in which it is used or the character of the party making use of it, - - as, for instance, a ship carpenter would understand something quite different when he made use of it from what a cabinet maker, or last-maker or a carriage builder would, - - and the question is, therefore, not what is the popular meaning as understood by any one class, *but its meaning as used in the statute, and how the legislators have employed it.*"

THE PULPWOOD

What is pulpwood? We are unaided by the evidence before us in arriving at a definition, but we feel that the nature

of pulpwood is so much a matter of common knowledge, especially in this state where its production is a major industry, that we may properly take judicial notice that pulpwood denotes wood logs, peeled or unpeeled, usually cut to four foot length, and suitable and intended for manufacture into wood pulp commonly used in making paper. (See *Bradley* v. *Fibre Company, supra; Bondur* v. *LeBourne,* 79 Me. 21). It partakes far more of the attributes of so-called "saw-logs" than it does the attributes of "manufactured lumber." Although all logs have had something done to them changing them from their original state of growing trees, the statute itself carefully distinguishes between logs and manufactured lumber. ("Logs in any town to be manufactured therein, and all manufactured lumber," R. S., 1944, Chap. 81, Sec. 13, Subsec. 1, as amended; See *Desjardins* v. *Lumber Co.,* 124 Me. 113.) The work done in producing pulpwood is preliminary to, and preparatory for, the ultimate intended process of making wood pulp. *Bradley* v. *Fibre Company, supra.* As was said in *United States* v. *Pierce,* 147 Fed. 199, "Rossed pulpwood is not a manufactured timber in any true sense. It would be absurd to call hand-peeled logs manufactured timber." We hold that pulpwood is not "manufactured lumber" within the meaning of R. S., 1944, Chap. 81, Sec. 13, Subsec. 1 as amended. Rather does it fall within the meaning of "logs" as used therein. Upon the evidence here, these pulpwood logs were not in Houlton "to be manufactured therein," nor were they "employed in trade" or "in the mechanic arts" in Houlton, in connection with any "store, storehouse, shop, mill, wharf, landing place or ship yard." The pulpwood was taxable in Bangor, that being the residence of the taxpayer, and appellant here is entitled to abatement of the tax thereon.

THE TIES.

The parties have stipulated that the railroad ties in question were "finished so that they were ready for use." We

360

may properly infer from this evidence in the light of common knowledge that all the necessary work of cutting, sawing to standard length, peeling, and facing with flat sides had been done and the ties were ready to be laid in position to support rails, their ultimate intended use. That railroad ties prepared for final use in the location where they were first cut have been there "manufactured" has been recognized many times. *Butler et al.* v. *McPherson Brothers,* 95 Miss. 635, 49 So. 257; *Mahan* v. *Clark,* 219 Pa. 229, 68 A. 667; *Johnson* v. *Truitt,* 122 Ga. 327, 50 S. E. 135. The dictum in *Sands* v. *Sands,* 74 Me. 239 at 240 applies only to the lien statute there interpreted. For the same reason we distinguish *Kollock* v. *Parcher,* 52 Wis. 393, 9 N. W. 67. The completed ties were "manufactured lumber" within the meaning of R. S., 1944, Chap. 81, Sec. 13, Subsec. 1 as amended, and not being "in the possession of a transportation company *and* in transit," they were taxable to appellant in Houlton, "the town where they were situated" on April 1, 1951. (See *Desjardins* v. *Lumber Co., supra*).

Inasmuch as the pulpwood and ties were assessed together for a single sum producing a tax of $28.35, and the appeal is here sustained only as to the portion of the tax allocable to the pulpwood in the amount of $17.13, the entry will be,

*Judgment for the Town of Houlton for $11.22, without costs.*